HAZOURI, J.
 

 Paul Daniel was placed on probation after pleading no contest to a charge of uttering a forged instrument. Daniel was also placed on probation when, in a separate case, he pled no contest to the charges of possession of cannabis and driving without a valid driver’s license. On September 27, 2006, an affidavit of violation of probation was filed against Daniel alleging that he (1) committed armed robbery, and (2) associated with Kendric Daniel who was engaged in criminal activity. The offenses alleged in the affidavit occurred on September 19, 2006.
 

 The subject of this consolidated appeal is the denial of a motion to suppress the stop and arrest of both Paul and Kendric Daniel. The motion to suppress is disposi-tive of the trial court’s determination that
 
 *1010
 
 Daniel violated his probation as a result of the offense of September 19, 2006. The trial court denied the motion to suppress and we affirm. Daniel argues that suppression was required because the detectives who made the arrest were from the City of Coconut Creek and were outside their jurisdiction at the time of the stop and arrest, which took place in the City of Margate. We disagree.
 

 On September 19, 2006, Detective John Leonard of the City of Coconut Creek was working as a supervisor of investigations. Detective Jenna Buckley was one of the detectives he was supervising. At 10:10 p.m., Leonard received a call that an armed robbery was occurring outside a Publix Supermarket. Leonard responded to the call within ten minutes. Buckley arrived shortly thereafter.
 

 While investigating the crime, Leonard spoke with the victims, Shenika Bobrin and Abdianee Telsaint. Bobrin described the perpetrator who “held the handgun that night” as a “black male” wearing a “white t-shirt wrapped around his head [with] blue jeans and a black T-Shirt.” She was unable to see the perpetrator’s face due to the t-shirt being wrapped around his head. She also described the vehicle the perpetrator fled in as a four-door vehicle and that it was a “dark green car, with very dark tinted windows and a temporary tag on the back.” She stated that the driver of the vehicle was a “black male wearing a lime green t-shirt.”
 

 Leonard then asked Bobrin if she knew who might have been involved in the robbery. She did not know, but mentioned that she did have a fight with a girl at school named Indra Odom. Based on this information, Leonard investigated Odom as a possible suspect or witness. Leonard ascertained Odom’s address and he and Buckley, via Leonard’s unmarked police car, went to Odom’s residence. Notably, the address was outside of Leonard’s jurisdiction, as it was in the City of Margate. Leonard and Buckley did not notify the Margate Police Department that they were investigating the crime before they entered the municipality.
 

 Leonard and Buckley arrived at Odom’s residence at 11:30 p.m., which was approximately an hour and a half after Leonard responded to the call at Publix. Odom lived about a five-minute drive from the Publix where the robbery took place. They went to the front door and knocked. A woman named Paulette Richardson answered and stepped onto the front porch to speak with the detectives. She told the detectives that Odom was not home. Richardson and the detectives spoke for about five minutes.
 

 During the discussion with Richardson, Leonard returned to his parked vehicle and stood by the passenger door. Buckley was still speaking with Richardson when Leonard heard loud music coming from an oncoming car. This drew his attention to three cars coming down the street toward him. One of the vehicles matched the description of the perpetrator’s car used during the armed robbery.
 

 The three cars pulled up to the area in front of Odom’s residence. The green car pulled directly in front of Leonard’s vehicle. At this time, Leonard verified that the car had a temporary tag and otherwise met the description of the car used in the armed robbery at Publix. Leonard approached the driver’s side of the green car and instructed the driver to roll the window down. The driver was wearing a lime green shirt and matched the description of the driver given by the victims of the armed robbery.
 

 Leonard, believing this was the driver from the armed robbery, immediately instructed the driver to shut the car off,
 
 *1011
 
 place the keys out through the window, and put them on the roof. The driver complied. Leonard then instructed the driver and passenger to place their hands on the dashboard. The driver put his hands on the dashboard, but the passenger failed to follow the directions and started moving his right hand between the passenger seat and door. Buckley approached. She saw the driver toss a silver object that appeared to be a gun onto the passenger’s lap. She also saw the passenger try to push the object off his lap.
 

 Leonard subsequently called for backup to get additional units from the City of Margate and the City of Coconut Creek. Upon the arrival of Margate police officers, Daniel was placed under arrest. A search of the car revealed a gun, papers belonging to the victim, and a white pullover shirt and purse.
 

 Daniel argues that suppression of his detention and arrest was warranted because Leonard and Buckley, detectives from the City of Coconut Creek, did not have jurisdiction to take action in the City of Margate. The state counters that the detectives acted in accordance with the “Mutual Aid Agreement”
 
 [1]
 
 entered into by both municipalities.
 

 “Generally, an officer of a county or municipality has no official power to arrest an offender outside the boundaries of the officer’s county or municipality.”
 
 Porter v. State,
 
 765 So.2d 76, 78 (Fla. 4th DCA 2000). However, an exception to this principle is when two enforcement agencies entered into a mutual aid agreement that permits the extraterritorial conduct by the outside police municipality.
 
 See State v. Allen,
 
 790 So.2d 1122, 1125 (Fla. 2d DCA 2001) (stating that an officer, by investigating a crime outside his jurisdiction, was acting improperly “unless saved by the voluntary cooperation agreement”).
 

 Specifically, the Florida Mutual Aid Act authorizes two or more law enforcement agencies operating in Florida to enter into a “mutual aid agreement.” § 23.1225(1), Fla. Stat. (2006). One type of agreement is a “voluntary cooperation written agreement,” which “permits voluntary cooperation and assistance of a routine law enforcement nature across jurisdictional lines.”
 
 Id.
 
 § 23.1225(l)(a). Such an agreement “must specify the nature of the law enforcement assistance to be rendered,” state “the procedures for requesting and for authorizing assistance,” and set
 
 *1012
 
 forth “any other terms and conditions necessary to give it effect.”
 
 Id.
 

 The trial court did not err in denying the motion to suppress because, at the time of the stop, Leonard and Buckley were engaged in conduct that was permissible under the Mutual Aid Agreement. The Agreement provides that “[o]n duty officers from one jurisdiction may conduct investigations (that originate in them jurisdiction).” Here, Leonard and Buckley, at the time of the stop at issue, were in the City of Margate investigating an armed burglary that took place about an hour and a half earlier at a Publix in the City of Coconut Creek which was a five minute drive from the place of the stop. Leonard and Buckley, upon making the stop, immediately alerted the Margate Police Department, following the provision of the Agreement that states: “If enforcement action is anticipated, the locations and nature of the investigation will be told to the agency’s on-duty communications liaison person.” Therefore, the stop and arrest were valid, as they were made in accordance with the Mutual Aid Agreement.
 

 Affirmed.
 

 GROSS, C.J., and TAYLOR, J., concur.
 

 [1]
 

 . The Mutual Aid Agreement for Voluntary Cooperation and Operational Assistance entered into by the City of Coconut Creek and the City of Margate states in pertinent part:
 

 The undersigned Governmental Entities in Broward County, Florida, together establish this mutual aid agreement pursuant to Section 23.1225(1), (2), Florida Statute[s], known as the Florida Mutual Aid Act. In accord with the authority granted therein, die jurisdictions agree to the following agreement covering voluntary cooperation and operational assistance. The agreement provides for law enforcement activities across jurisdictional lines in certain defined circumstances for the purpose of protecting the public peace and safety and preserving the lives and property of the citizens of each Governmental Entity.
 

 I.
 
 VOLUNTARY COOPERATION:
 
 The undersigned Governmental Entities recognize that an increasing number of criminals are operating in more than one jurisdiction, and that there is a need for a continuing multi-city response to this threat. The following voluntary cooperation agreement is created to provide this capability.
 

 B.
 
 Voluntary investigations:
 

 On-duty officers from one jurisdiction may conduct investigations (that originate in their jurisdiction) in any of the undersigned jurisdictions. If enforcement action is anticipated, the locations and nature of the investigation will be told to the agency's on-duty communications liaison person.